**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| GARRET OSTERGAARD, DAVID WADE, and JOY WADE, individually, and on behalf of all others similarly situated, | ) | |
| Plaintiffs, | ) | Case No. 2:26-cv-1169 |
| vs. | ) | |
| MICROSOFT CORPORATION, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Plaintiffs, Garret Ostergaard, David Wade, and Joy Wade, on behalf of themselves and all others similarly situated, bring this putative class action against Microsoft Corporation (hereinafter the "Defendant"), which operates and maintains the Data Center located at 4800 90th St, Mt Pleasant, WI 53403 (hereinafter the "Data Center")

2. Through its operation and maintenance of the Data Center, Defendant has emitted, and continues to emit, unreasonable and excessive noise onto Plaintiffs' properties, thereby causing property damage through private nuisance and negligence.

## PARTIES

3. At all times relevant hereto, Plaintiff Garret Ostergaard is a citizen of Wisconsin who has owned and resided at his home located at 8717 Citadel Terrace, Sturtevant, WI 53177.

4. At all times relevant hereto, Plaintiff David Wade is a citizen of Wisconsin who has owned and resided at his home located at 8401 Westminster Drive, Sturtevant, WI 53177.

5. At all times relevant hereto, Plaintiff Joy Wade is a citizen of Wisconsin who has owned and resided at her home located at 8401 Westminster Drive, Sturtevant, WI 53177.

6. Defendant and/or its agents have at all times relevant hereto owned, constructed, operated, and/or maintained the Data Center located at 4800 90th St, Mt Pleasant, WI 53403.

7. Defendant Microsoft Corporation is a foreign business corporation headquartered in Redmond, Washington and incorporated under the laws of the State of Washington.

8. Defendant may receive service through its registered agent, Corporation Service Company, located at 33 East Main Street, Suite 610, Madison, Wisconsin 53703.

9. Defendant, including its predecessors and agents, maintains and operates the Data Center and has exercised control and ownership over the Data Center at all times relevant hereto.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a)(1).

11. Independent of, and in addition to original jurisdiction under 28 U.S.C. § 1332(a)(1), this Court has original jurisdiction over this Action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are 100 or more putative Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000) exclusive of interest and costs. Additionally, at least one, if not all, class members are a citizen of a different state from Defendant, establishing minimal diversity.

12. The Court has personal jurisdiction over Defendant, who has sufficient minimum contacts with the State of Wisconsin, because it regularly conducts substantial business in Wisconsin through its operation and maintenance of the Data Center, and Plaintiffs' claims arise through such contacts with the forum state.

13. Exercising personal jurisdiction over Defendant for its contacts satisfies due process and does not offend traditional notions of fair play and substantial justice because Defendant has purposefully availed itself of the laws of the State of Wisconsin and it benefits by regularly conducting business through its industrial operations in the state.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events, acts, and/or omissions giving rise to Plaintiffs' claims took place in this judicial District, and because much, if not all, of the property that is the subject of this action is situated in this judicial District.

## FACTUAL ALLEGATIONS

15. Defendant owns and operates a Data Center located at 4800 90th St, Mt Pleasant, WI 53403, where it generates revenue through the operation of a massive supercomputer used in artificial intelligence (AI) services.

16. On frequent, recurrent, and continuing occasions too numerous to list herein, Plaintiffs' properties have been and continue to be physically invaded by excessive noise from Defendant's Data Center.

17. The noise which entered and continues to enter Plaintiffs' properties originated from Defendant's Data Center as a result of intentional and/or negligent acts and/or omissions.

18. These excessive noise emissions caused by Defendant's Data Center have been and continue to be emitted across public and private land within the Class Area.

### ***Defendant's Fairwater Data Center Operations***

19. Following a period of two years of construction, Defendant's Fairwater Data Center became fully operational by June of 2026.[1] This is the first of several components to the Fairwater Data Center. The completed initial phase 1 campus spans 315 acres and houses three separate, massive buildings with a combined area of 1.2 million square feet.[2]

20. However, local authorities have approved an additional 15 data center buildings for the Mount Pleasant site after Microsoft gained approval for another 1,000-acre expansion. The company has since purchased a 160-acre parcel it acquired for $43 million in August.[3]

21. Construction of the second facility immediately adjacent to the first Data Center is ongoing. The addition to the first phase of the construction is scheduled to continue until 2028.[4]

22. It is unclear how long construction of the entire Data Campus will take and when the massive campus will be complete.

23. Defendant has touted that its Fairwater Data Center will be "the world's most powerful AI datacenter."[5]

---

[1] https://news.microsoft.com/source/2026/06/23/microsoft-completes-construction-on-first-datacenter-facility-in-mount-pleasant-wisconsin?msockid=0876a222f1d9683b0539b46af05f69ca (Last accessed August 31, 2026)
[2] https://blogs.microsoft.com/blog/2025/09/18/inside-the-worlds-most-powerful-ai-datacenter/ (Last accessed August 31, 2026)
[3] https://www.datacenterdynamics.com/en/news/microsoft-given-greenlight-for-15-more-data-center-buildings-in-mount-pleasant-wisconsin/ (Last accessed August 31, 2026)
[4] *Id.*
[5] https://blogs.microsoft.com/blog/2025/09/18/inside-the-worlds-most-powerful-ai-datacenter/ (Last accessed August 31, 2026)

24. To power its equipment, Defendant's Data Center requires 337.6 megawatts (MW) of power,[6] which is the energy demand of a medium-sized city. Defendant has stated that the Data Center may require 900 MW of capacity in only a few years.[7]

25. Data Centers like Defendant's Fairwater Data Center require a substantial and continuous onsite power supply for their servers, which invariably requires the use of backup generators and sophisticated cooling systems to regulate temperature and humidity in their server rooms.[8] These systems operate at all times of the day and night.

26. These servers produce significant amounts of heat that can damage the chips integral to data processing. As a result, Data Centers, including Defendant's Fairwater Data Center, employ massive cooling systems to manage the heat produced by the servers.

27. These cooling systems are integral and oftentimes extensive, with some cooling systems accounting for up to 40% of a Data Center's energy consumption.[9]

28. Defendant's Fairwater Data Center generates significant noise pollution from diesel generators and heating, ventilation, and air conditioning (HVAC) systems, including chillers, cooling towers, air-handling units, and condenser fans. These systems may create persistent industrial noise with internal levels of 70-90 A-weighted decibels (dBA) and community-facing levels that can exceed 48-60 dBA without adequate mitigation.[10]

---

[6] https://www.crn.com/news/data-center/2025/microsoft-unveils-world-s-most-powerful-ai-datacenter-president-brad-smith-says (Last accessed August 31, 2026)
[7] https://www.fox6now.com/news/microsoft-wisconsin-next-infrastructure-investment-announced
[8] https://www.eesi.org/articles/view/communities-are-raising-noise-pollution-concernsabout-data-centers (Last accessed August 31, 2026)
[9] *Id.*
[10] George, Babu. *Health Consequences of Large Data Centers: Air Pollution, Noise, Water Use, and Environmental Justice*. No. cnwyb_v1. Center for Open Science, 2026. Stable link: https://osf.io/download/69a8a7d20a7fcea28b79774f/ (Last accessed August 31, 2026).

29. Defendant's Data Center operates 24 hours a day, 7 days a week. The noise emitted from the Data Center, and experienced by Plaintiffs and the Class, is not only excessive, but consistent and pervasive.

30. As most municipal noise ordinances regulate excessive noise based on the A-weighted decibel scale, dBA measures do not effectively detect lower frequency sounds like those emitted by Defendant's Data Center operations.

31. Although some of the Data Center's operations generate significant dBA levels from the backup generators, much of the "low hum" noise is low-frequency infrasound that is not detected and reflected in dBA measurements.

32. Accordingly, "[d]ata center cooling—massive chillers, slow turning fans, compressor arrays—generates exactly the long wavelength noise" that is not adequately measured using dBA.[11]

33. Local authorities are therefore largely unable to sufficiently regulate noise emitted from Defendant's Data Center because decibel meters do not reliably measure the frequencies emitted by the Data Center.[12]

34. The nuisance effects of the infrasound from Defendant's Data Center are substantial. Unlike higher frequency dBA noise, infrasound "propagates over long distances with minimal atmospheric attenuation, penetrates structural barriers that attenuate high frequency noise

---

[11] https://www.yahoo.com/news/science/articles/devastating-effects-ai-data-center-150652814.html (Last accessed August 31, 2026)
[12] https://www.eesi.org/articles/view/communities-are-raising-noise-pollution-concernsabout-data-centers (Last accessed August 31, 2026)

**but amplify [infrasound]**, and produce physiological effects at frequency levels too low to be audibly received by most affected individuals."[13]

35. A properly operated, maintained, and/or constructed Data Center will contain, capture, or otherwise prevent the emission of excessive noise from its generators and cooling systems by implementing soundproofing equipment, such as noise-absorbent materials, sound blankets, and sound attenuators.

36. A properly operated, maintained, and/or constructed Data Center will contain, capture, or otherwise prevent the emission of excessive noise from its generators and cooling systems by utilizing acoustic barriers, shields, and walls in and around the perimeter of its property.

37. A properly operated, maintained, and/or constructed Data Center will contain, capture, or otherwise prevent the emission of excessive noise from its generators and cooling systems by designing and implementing low-noise cooling systems.

38. Defendant has failed to implement adequate soundproofing equipment at its Data Center that properly absorbs, captures, and/or prevents the escape of noise, thereby resulting in the offsite emission of excessive noise beyond its property.

39. Defendant has failed to implement adequate acoustic barriers, shields, or walls, that absorb, mitigate, and/or prevent the escape of noise, thereby resulting in the offsite emission of excessive noise beyond its property.

40. Defendant has failed to implement adequate low-noise cooling systems that contain, mitigate, and/or prevent the escape of noise, thereby resulting in the offsite emission of excessive noise beyond its property.

---

[13] https://www.researchgate.net/publication/404091168_Infrasonic_and_Low-Frequency_Noise_Exposure_from_Large_Data_Centers_A_Proposed_Analytical_Framework (Last accessed August 31, 2026)

### ***Defendant's Excessive Noise Emissions***

41. Defendant has failed to follow proper industrial practices to prevent the offsite emission of noise, and has failed to absorb, capture, mitigate, and/or prevent noise from escaping its Data Center, thereby invading the homes and properties of Plaintiffs and the Class.

42. The noise emissions from Defendant's Data Center are loud, annoying, and pervasive.

43. Defendant's Data Center has been the subject of frequent and numerous complaints from residents in the nearby residential area.

44. The Wisconsin Department of Natural Resources (WDNR) has received numerous public comments and complaints from residents regarding the noise emissions from Defendant's Data Center. Below is sample of the comments regarding the Data Center's noise emissions and effects on community residents:

a. On April 26, 2026, local resident Amy Cimbalnik reported that "Over the last two years we have endured the constant and rhythmic banging of construction from sunrise past sunset daily from construction crews as the Microsoft Data Center was being built. We had about six months of peace and quiet return, but then early February 2026 we noticed a different constant noise. It sounded similar to the whirring engine of a freight train parked nearby. We heard it 24 hours a day and eventually realized it was coming from the Microsoft campus."

b. On April 28, 2026, local resident Matt Kauffman stated that "I do not support changing the emission limits for the data center or any other industry in our neighborhood. I do not support changes in the fuel usage limits in our area. The centers are already creating enough chemical and noise pollution already."

c. On April 28, 2026, local resident Laura Strickling stated that "My neighbors' quality of life has decreased since the introduction of data center infrastructure to our area. The value of their homes has decreased as no one wants to live near a data center."

45. Numerous households have contacted Plaintiffs' counsel documenting the noise they attribute to the Defendant's Data Center.

46. Below is a small sample of the factual allegations made by putative class members to Plaintiffs' counsel, demonstrating the Data Center is the source and cause of the noise, which has caused damage to neighboring properties and their use and enjoyment thereof:

a. Plaintiff Garret Ostergaard stated that he had been working a third shift but had to move to second shift because of the constant noise affecting his sleep. He stated that there is noise all day and night, and bright lights coming from the facility. Plaintiff Garret Ostergaard has worked for Mount Pleasant's police department and has personally observed numerous noise complaints related to Defendant's Data Center.

b. Plaintiffs David and Joy Wade reported that "After moving in, we installed a large patio and built a gazebo. We enjoy sitting out there all times of the day, but especially at night when things have quieted down and we're relaxing. Since this facility has been constructed, we now hear a distracting tone/hum in the evenings." "It was in the evenings we started hearing a loud, constant hum that was very disruptive to our environment. The sounds of tranquil nighttime nature were overshadowed by the data center noise and we stopped spending time outside in our backyard. Even in the house we could not have the windows open unless we wanted to hear the 'Microsoft hum'... When we decided to take evening walks around neighborhood we would avoid going south or just drive somewhere else all together to go for a walk."

c. Putative Class Member Steven Diavila stated that he is "unable to enjoy the silence we once appreciated. Windows would remain closed to minimize the disturbance, but would not eliminate it."

d. Putative Class Members Jason and Amanda Ingle indicated that "We hear a constant humming noise while trying to enjoy our outside patio/yard. [It's] very annoying! Since the data center construction less people hang outside in the neighborhood now, very sad to see."

47. Defendant's Data Center has also been subject of significant scrutiny in local media regarding its noise emissions.[14,15]

---

[14] https://www.wgtd.org/news/microsoft-fields-data-center-noise-complaints-public-meeting (Last accessed August 31, 2026)

[15] https://racinecountyeye.com/2026/05/13/microsoft-375-jobs-noice-resolution/ (Last accessed August 31, 2026)

48. Village President of Sturtevant, Mike Rosenbaum, stated in a Microsoft Q&A that "It's my home. It's my constituents' home. I don't need to be driving people out of my village because of some fan noise."[16]

49. Beth Kane, a resident living one mile from Defendant's Data Center, stated "It's a nightmare. I've lived there five years. I want to leave. It's no longer fun. I've got headaches. We've got box fans running in order to cover the sound at night."[17]

50. Defendant has publicly acknowledged noise complaints raised by community residents, stating through its public relations representative "We're aware of the noise concerns raised about our Mt. Pleasant facility. We're investigating the root causes and hope to share an update soon."[18]

51. On April 15, 2026, Defendant issued the following statement regarding noise emission from its Data Center:

> "Over the past several weeks, as we have begun to bring equipment online at the Mount Pleasant 'Fairwater 1' data center, community members north of the datacenter have noticed a tonal humming sound and shared their concerns with us. Although the facility noise levels meet the requirements set by the local ordinance, we take this feedback seriously and understand the impact this has had on our neighbors. Our engineering team and consultants on site have investigated the source of the sound. They have discovered that it comes from cooling fans that are currently operating at high speeds. We anticipated that our systems would need adjustments and create some noise as part of the datacenter startup, but we did not expect the tonal quality of the sound to travel as far as it has."[19]

[16] https://www.wisn.com/article/microsoft-holds-qa-about-mount-pleasant-ai-data-center-doesnt-offer-solution-to-persistent-humming-noise/70980256 (Last accessed August 31, 2026)
[17] *Id.*
[18] https://www.wgtd.org/news/microsoft-fields-data-center-noise-complaints-public-meeting (Last accessed August 31, 2026)
[19] https://local.microsoft.com/blog/testing-underway-to-understand-noise-at-our-mount-pleasant-datacenter/ (Last accessed August 25, 2026)

52. Following this statement, Microsoft provided two updates on June 18, 2026, and July 20, 2026, respectively, stating that they have "continued to evaluate sound at our facility" and "continue to work on short-term mitigation." Defendant further stated that it "will also install additional sound reduction components" over the next several months. [20]

53. Defendant further stated that it has "conducted tests" concerning noise emissions from its Data Center and "will continue to monitor sound at the site."[21]

54. Despite knowledge of its excessive and constant noise emissions, the Data Center continues to emit excessive noise outside the bounds of its property.

55. The Data Center's excessive noise emissions are offensive to Plaintiffs and the putative Class Members and would be offensive to a reasonable person of ordinary health and sensibilities.

56. The Data Center's excessive noise emissions have caused property damage and substantially interfered with the abilities of Plaintiffs and the putative Class to reasonably use and enjoy their homes and properties.

57. The Data Center's excessive noise emissions have adversely impacted the marketability and value of Plaintiffs' and the Class's properties to potential buyers.

58. The invasion of Plaintiffs' and the Class's properties by excessive noise from the Data Center has reduced the value of those properties.

59. Plaintiffs and the putative Class are a limited subset of individuals in Racine County and the Class Area, which includes only owner-occupants and renters of residential properties who live within the Class Area.

---

[20] *Id.*
[21] *Id.*

60. Defendant knew or reasonably should have known about its excessive noise emissions through the numerous complaints, administrative records, communications with local government, public scrutiny, and media attention it has received regarding the Data Center.

61. Despite clear knowledge of the Data Center's excessive noise emissions, Defendant continues to operate the Data Center in breach of its duty of ordinary care and diligence.

62. Defendant intentionally, knowingly, recklessly, willfully, and/or negligently failed to properly construct, maintain, and/or operate the Data Center. Through Defendant's failures, the Data Center has caused an invasion of Plaintiffs' and the putative Class's private residential properties by excessive noise on frequent, intermittent, and reoccurring occasions too numerous to list individually.

## CLASS ALLEGATIONS

63. Plaintiffs bring this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification, pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek to represent a Class of persons defined as:

> **All owner-occupants and renters of residential property residing at any time within the applicable statute of limitations in the following geographical area:**
>
> **Starting at Braun Road and 90th Street, follow Braun Road east to the railroad tracks. Proceed north along the railroad tracks to Durand Avenue. Follow Durand Avenue west to where it intersects with railroad tracks. Continue south on the railroad tracks to Braun Road. Proceed east on Braun Road to the point of origin.**

**The Class Area is further depicted in the map below:**




The definitional boundary is subject to modification as discovery will disclose the location of all persons properly in the Class ("Class Members"). Plaintiffs reserve the right to propose one or more subclasses if discovery reveals that such subclasses are appropriate.

64. This case is properly maintainable as a class action pursuant to and in accordance with Federal Rule of Civil Procedure 23 in that:

a. The Class, which includes thousands of members, is so numerous that joinder of all members is impracticable;

b. There are substantial questions of law and fact common to the class including those set forth in greater particularity herein;

c. Questions of law and fact such as those enumerated below, which are all common to the class, predominate over any questions of law or fact affecting only individual members of the class;

d. A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

e. The relief sought in this class action will effectively and efficiently provide relief to all members of the class;

f. No unusual difficulties are foreseen in the management of this class action; and,

g. Plaintiff, whose claims are typical of those of the Class, through their experienced counsel, will zealously and adequately represent the Class.

**A. Numerosity**

65. Based on available data, there are over a thousand residential households within the Class Area and therefore the proposed Class is so numerous that joinder is impracticable.

**B. Commonality**

66. Numerous common questions of law and fact predominate over any questions affecting individual Class Members, including, but not limited to the following:

a. Whether and how Defendant negligently and knowingly failed to reasonably construct, maintain, and/or operate the Data Center to prevent off-site noise emissions;

b. Whether Defendant owed any duties to Plaintiffs;

c. Which duties Defendant owed to Plaintiffs;

d. Which steps Defendant has or has not taken to control the emission of noise through its maintenance and operation of the Data Center;

e. Whether and to what extent the Data Center's noise dispersed over the Class Area;

f. Whether it was reasonably foreseeable that Defendant's failure to properly construct, maintain, and/or operate the Landfill would result in an invasion of Plaintiffs' property interests;

g. Whether the degree of harm suffered by Plaintiffs and the Class constitutes a substantial annoyance or interference under an objective legal standard; and,

h. The proper measure of damages incurred by Plaintiffs and the Class.

67. The availability of common proof as to a limited subset of the above questions of law and fact may otherwise permit issue certification under Fed. R. Civ. P. 23(c)(4).

**C. Typicality**

68. Plaintiffs have the same interests in this matter as all the other members of the Class, and their claims are typical of all members of the Class. If brought and prosecuted

individually, the claims of each Class Member will require proof of many of the same material and substantive facts, rely upon the same legal theories, and seek the same type of relief.

69. The claims of Plaintiffs and the other Class Members have a common origin and share a common basis. The claims originate from the same failure of the Defendant to properly construct, maintain, and/or operate the Data Center.

70. All Class Members have suffered injury in fact resulting in the loss of property value by way of Defendant's failure to properly construct, maintain, and/or operate the Data Center as described herein, including a substantial interference with the use and enjoyment of their properties as well as diminished property values.

**D. Adequacy of Representation**

71. Plaintiffs' claims are sufficiently aligned with the interests of the absent members of the Class to ensure that the Class's claims will be prosecuted with diligence and care by Plaintiffs as representatives of the Class. Plaintiffs will fairly and adequately represent the interests of the Class and do not have interests adverse to the Class.

72. Plaintiffs have retained the services of counsel, who are experienced in complex class action litigation, and in particular class actions involving air pollution and nuisance emissions from industrial facilities. Plaintiffs' counsel will adequately prosecute this action and will otherwise protect and fairly and adequately represent Plaintiffs and all absent Class Members.

**E. Class Treatment is the Superior Method of Adjudication**

73. A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a. Individual claims by the Class Members would be impracticable as the costs of pursuit would far exceed what any one Class Member has at stake;

b. Little or no individual litigation has been commenced over the controversies alleged in this Complaint and individual Class Members are unlikely to have an interest separately prosecuting and controlling individual actions;

c. The concentration of litigation in these claims in one forum will achieve efficiency and promote judicial economy; and,

d. The proposed class action is manageable.

74. Further, class treatment of Plaintiffs' claims is appropriate and necessary to ensure that common relief is available to the Class and that Class Members can vindicate their rights in a single proceeding.

75. Notice can be provided to members of the Class by U.S. mail and/or publication.

## COUNT I – PRIVATE NUISANCE

76. Plaintiffs restate the allegations of this Complaint as if fully restated herein.

77. Defendant owed, and continues to owe, a duty to Plaintiffs and to the Class to prevent and abate the unreasonable interference with, and the invasion of, their private property interests.

78. The excessive noise which enters the Plaintiffs' and Class's properties originated from the Data Center, which was improperly and unreasonably constructed, maintained and/or operated by the Defendant as described herein.

79. Plaintiffs and the Class utilize their properties residences and reside within the Class Area.

80. The excessive noise which entered Plaintiffs' and the Class's properties originated from Defendant's Data Center, which is in close proximity to the Class Area.

81. By failing to reasonably design, construct, operate, repair, and maintain its Data Center, Defendant has caused an invasion of Plaintiffs' and Class's properties by excessive noise on unusually frequent occasions that are too numerous to comprehensively list herein.

82. The excessive noise emissions invading Plaintiffs' and Class's properties are indecent and offensive to individuals with ordinary sensibilities. The excessive noise substantially and unreasonably interferes with Plaintiffs' and Class's enjoyment of life and the ability to use and enjoy their properties. This includes, but is not limited to:

a. Forcing Plaintiffs and Class Members to remain inside their homes and forego the use of their yards, porches, and other spaces, and to generally refrain from outdoor activities;

b. Causing Plaintiffs and Class Members to keep their doors and windows closed when they would otherwise have them open;

c. Depriving Plaintiffs and Class Members of the value of their homes and properties, including the marketability thereof; and,

d. Interfering with Plaintiffs' and Class Members' sleep and preventing them from reasonably relaxing in their homes and/or on their properties.

83. By failing to reasonably construct, maintain, and/or operate the Data Center, Defendant has wrongfully, negligently, and knowingly created a foreseeable risk of harm and caused an unreasonable invasion of Plaintiffs' and Class's properties by excessive noise.

84. The excessive noise emissions from Defendant's Data Center are recurring, ongoing, and abatable with ordinary care.

85. By failing to reasonably construct, maintain, and/or operate the Data Center, thereby causing excessive noise to invade Plaintiffs' and Class's properties, Defendant intentionally, knowingly, recklessly, and/or negligently failed to abate a nuisance that substantially and unreasonably interferes with Plaintiffs' and Class's properties.

86. Defendant owed, and continues to owe, a duty to Plaintiffs and the putative Class to prevent and abate the unreasonable interference of their private property interests.

87. As a foreseeable, direct, and proximate result of the Defendant's misconduct as described herein, Plaintiffs and the Class suffered, and continue to suffer, damages to their properties as alleged herein.

88. Plaintiffs and Class Members did not consent to the invasion of their properties by Defendant's excessive noise, which is ongoing and constitutes a nuisance.

89. Any social utility that is provided by the Data Center is patently outweighed by the harm suffered by the Plaintiffs and the Class, who have on frequent occasions been deprived of the full use and enjoyment of their properties and have endured substantial loss in the use and value of their properties.

90. Defendant's substantial and unreasonable interference with Plaintiffs' and Class's use and enjoyment of their properties constitutes a private nuisance. Defendant is liable for all damages arising from such nuisance, including compensatory, injunctive, and/or punitive relief.

## <u>COUNT II – NEGLIGENCE</u>

91. Plaintiffs restate the allegations of this Complaint as if fully restated herein.

92. Defendant owed, and continues to owe, a duty to Plaintiffs and the Class to prevent and abate the unreasonable interference with, and the invasion of, their private property interests.

93. A properly constructed, operated, and maintained data center will not emit excessive noise into neighboring residential areas.

94. Defendant breached its duties by negligently and improperly constructing, maintaining, and operating the Data Center. This includes, but is not limited to:

a. Constructing, operating, and/or maintaining inadequate soundproofing equipment for its Data Center operations, including its cooling systems and/or generators;

b. Constructing, operating, and/or maintaining inadequate acoustic barriers, walls, and shields for its Data Center operations, not limited to insufficient acoustic coverage on or around the perimeter of the Data Center;

c. Failing to construct, operate, and/or maintain low-noise cooling systems at the Data Center;

d. Failing to develop and/or implement an adequate noise monitoring system;

e. Failing to develop and/or implement an adequate noise prevention plan;

f. Failing to utilize other noise prevention, elimination, and mitigation measures and technology available to Defendant; and

g. Other failures revealed during discovery.

95. By failing to properly construct, maintain, and/or operate its Data Center, Defendant has failed to exercise its duty of ordinary care and diligence.

96. Defendant has been on actual notice of excessive and persistent noise emissions since at least April 15, 2026, when it issued its first public statement regarding how it planned to address the noise emissions.

97. Defendant has now had months to implement short-term noise mitigation measures that it should have implemented prior to bringing its Data Center operation online and, according to its public updates on June 18, 2026, and July 20, 2026, respectively, has implemented some noise mitigation infrastructure.

98. Defendant's breach of its duty of care was the direct and proximate cause of the invasion of Plaintiffs' and Class's homes by constant excessive noise.

99. Such invasions by excessive noise were the reasonably foreseeable result of Defendant's misconduct, and Plaintiffs and the Class have suffered damages to their properties as alleged herein. Such damages include but are not limited to the loss of use and enjoyment of their properties and the diminution of property values. By failing to properly operate and maintain the Data Center, Defendant has failed to exercise its duty of ordinary care and diligence so that excessive noise would not invade Plaintiffs' properties.

100. Defendant knowingly, recklessly, and with conscious disregard for the rights of Plaintiffs and the Class, failed to prevent the invasion of excessive noise upon Plaintiffs' and the Class's properties.

101. Defendant could reasonably anticipate that the invasion of the Data Center's excessive noise upon the Plaintiffs' and Class's properties would result in property damages in the form of the loss of use and enjoyment and the diminution of property values.

102. Defendant is liable for all damages arising from such negligence, including compensatory, injunctive, and/or punitive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, pray for judgment as follows:

A. Certification of the proposed Class by order pursuant to Fed. R. Civ. P. 23;

B. Designation of Plaintiffs as representatives of the proposed Class and designation of their counsel as Class Counsel;

C. Judgment in favor of Plaintiffs and the Class Members and against Defendant for each cause of action stated herein;

D. An award to Plaintiffs and the Class Members for compensatory and exemplary damages, including pre- and post-judgement interest;

E. An award of attorneys' fees and costs, including pre- and post-judgement interest as allowable by law;

F. An Order holding that the entrance of the aforementioned excessive noise upon Plaintiffs' and Class's properties constitutes a nuisance;

G. An Order holding that Defendant was negligent in causing excessive noise to repeatedly invade and interfere with Plaintiffs' and the Class's private residential properties;

H. An award to Plaintiffs and the Class Members for injunctive relief not inconsistent with the Defendant's local, state, and federal regulatory obligations; and,

I. Such further relief, both general and specific, that this Honorable Court deems just and proper.

**JURY DEMAND**

Plaintiffs respectfully demand a trial by jury on all issues raised in this Complaint, pursuant to Fed. R. Civ. P. 38.

Dated: August 31, 2026

/s/ *Electronically signed by: Laura L. Sheets*


**LIDDLE SHEETS P.C.**

Laura L. Sheets
Steven D. Liddle
D. Reed Solt
Trenten J. Ingell
*Attorneys for Plaintiffs*
975 E. Jefferson Avenue
Detroit, MI 48207-3101
(313) 392-0015
Sliddle@lsclassaction.com
Lsheets@lsclassaction.com
Rsolt@lsclassaction.com
Ingell@lsclassaction.com

**HANSEN REYNOLDS, LLC**
Michael C. Lueder
301 N. Broadway, Suite 400
Milwaukee, WI 53202
Telephone: (414) 455-7676
E-mail: mlueder@hansenreynolds.com

*Attorneys for Plaintiffs*